UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES M. DEPWEG,

   Plaintiff,     Case No. 2:14-CV-11705
           District Judge Gerald E. Rosen
v.           Magistrate Judge Anthony P. Patti

COMMISSIONER OF
SOCIAL SECURITY,

   Defendant.
_____/

**RECOMMENDATION TO GRANT DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (DE 15) AND TO DENY PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT (DE 14)**

**I.**  **RECOMMENDATION**: For the reasons that follow, it is

**RECOMMENDED** that the Court **GRANT** Defendant's motion for summary

judgment (DE 15), **DENY** Plaintiff's motion for summary judgment (DE 14), and

**AFFIRM** the Commissioner's decision.

**II.**  **REPORT**

   Plaintiff, James M. Depweg, brings this action under 42 U.S.C. §§ 405(g)

and 1383(c)(3) for review of a final decision of the Commissioner of Social

Security ("Commissioner") denying his applications for social security disability

insurance benefits and supplemental security income. This matter is before the

United States Magistrate Judge for a Report and Recommendation on Plaintiff's

motion for summary judgment (DE 14), the Commissioner's memorandum in opposition and cross motion for summary judgment (DE 15), Plaintiff's reply (DE 16), and the administrative record (DE 11).

### A.    Background

Plaintiff initially filed his application for disability insurance benefits and for supplemental security income on September 4, 2009, alleging that he has been disabled since April 1, 2008.  (R. at 155.)  Plaintiff's applications were denied and he sought a *de novo* hearing before an Administrative Law Judge ("ALJ").  ALJ Kim Soo Nagle held a hearing on May 6, 2011 and subsequently determined that Plaintiff was not disabled within the meaning of the Social Security Act.  Plaintiff initially appealed the decision, but then requested that the Appeals Council withdraw his request for review.  (R. at 172.)  Accordingly, Plaintiff could not file an appeal with this Court.  ALJ Nagle's decision therefore became the Commissioner's final decision.

In the instant action, Plaintiff protectively filed his applications for benefits on September 23, 2011, alleging, again, that he has been disabled since May 1, 2008, at age 43.  (R. at 176.)  Plaintiff's applications were again denied.  Plaintiff sought a *de novo* hearing before an Administrative Law Judge ("ALJ").  ALJ Paul W. Jones held a hearing on December 9, 2013 and subsequently determined that Plaintiff was not disabled within the meaning of the Social Security Act.  On

March 6, 2014, the Appeals Council denied Plaintiff's request for review.  ALJ

Jones' decision became the Commissioner's final decision.  Plaintiff then timely

commenced the instant action.

### B.    Plaintiff's Medical History

On October 12, 2009, Plaintiff was evaluated by Michael Sheth, M.D., at

the Allegiance Pain Management Center.  (R. at 351.)  Plaintiff presented to Dr.

Sheth complaining of lower back pain that made sleeping difficult.  Dr. Sheth

summarized the results of Plaintiff's April 4, 2009 MRI, noting that it revealed

multilevel degenerative disc disease.  (R. at 352.)  Dr. Sheth noted that Plaintiff

had a steady gait and was able to heel-toe walk.  At the end of the visit, Plaintiff

indicated that he was not interested in further interventional therapies, and Dr.

Sheth made no changes to his medication.  (R. at 353.)

Plaintiff underwent a procedure in which a malpositioned screw was

removed from his calcaneus.  (R. at 401.)  On May 3, 2011, he presented to Tudor

Tien, M.D., at Allegiance Orthopedics, for follow-up.  Plaintiff noted that he had

some numbness in his foot, but Dr. Tien found that he was "doing well" and that

"his incisions are healing nicely" with "no signs of infection."  (R. at 401.)

Plaintiff presented for a follow-up appointment on September 8, 2011 with Dr.

Tien, who noted that Plaintiff's incision was well-healed, and x-rays of his left foot

showed that the fracture was healed in good alignment.  (R. at 399.)

Siddharth Shetger, D.O., examined Plaintiff on behalf of the State Agency on March 21, 2013.  (R. at 402-406.) Upon examination, Dr. Shetger found Plaintiff's muscle strength to be 5/5 throughout.  He also noted that Plaintiff's grip strength was full and his digital dexterity was intact, although Plaintiff had a positive Tinel's and Phalen's sign bilaterally.  (R. at 405.)

On May 1, 2013, Craig S. Brown, Ed.D., performed a mental status examination on behalf of the State Agency.  He summarized Plaintiff's report that he felt worthless, but was focused on God.  (R. at 407.)  Dr. Brown noted that he had to repeat his questions because Plaintiff's responses were often unrelated to the question asked.  Dr. Brown referred to Plaintiff's previous diagnoses of major depressive disorder and personality disorder, not otherwise specified.  Plaintiff described a typical day as going to bed at 9:00 p.m., waking at 4:00 a.m., watching religious shows on television, and going outside to feed the birds and squirrels.  (R. at 411.)  Dr. Brown noted that Plaintiff had a normal cognitive speed, but moved slowly.   He reported that Plaintiff's stream of mental activity was spontaneous and illogical at times.  (R. at 412.)  In a test for attention and concentration, Plaintiff's result was normal.  (R. at 414.)  Dr. Brown diagnosed Plaintiff with major depressive disorder, reading disorder, disorder of written expression, and personality disorder.  (R. at 418.)  He assigned Plaintiff a global assessment

4

functioning score of 46.[1]  Dr. Brown concluded that Plaintiff was angry and
depressed.

### C.    Hearing Testimony

#### 1.    Plaintiff's Testimony

Plaintiff initially appeared *pro se* before the ALJ on September 30, 2013.
The ALJ granted him an extension of time in which to retain counsel, but noted
that, after the extension the hearing would go ahead whether Plaintiff was
represented by counsel or not.  (R. at 89.)  Plaintiff again appeared *pro se* at the
December 9, 2013 hearing.  He testified that he had only been able to find one
attorney who could take his case, but that person was not available until some
indefinite date in 2014.  (R. at 41.)  Plaintiff indicated that he had been unable to
look for an attorney because he was bedridden for four weeks after breaking his
collar bone.  This injury occurred when he fell off a ladder when attempting to

---

[1] The GAF scale was used to report a clinician's judgment of an individual's
overall level of functioning.  Clinicians selected a specific GAF score within the
ten-point range by evaluating whether the individual was functioning at the higher
or lower end of the range.  *See* American Psychiatric Ass'n, Diagnostic and
Statistical Manual of Mental Disorders 33–34 (American Psychiatric Association,
4th ed. text rev. 2000) (DSM-IV-TR).  A GAF score of 41-50 was indicative of
serious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent
shoplifting) or any serious impairment in social, occupational, or school
functioning (e.g., no friends, unable to keep a job).  DSM-IV-TR at 34.  However,
"the most recent version of the DSM does not include a GAF rating for assessment
of mental disorders."  *Bryce v. Comm'r of Soc. Sec.*, No. 12-CV-14618, 2014 WL
1328277, at *10 (E.D. Mich. Mar. 28, 2014).

change a lightbulb.  (R. at 42.)  According to Plaintiff, his doctor indicated that his collar bone was healing, but would take another four weeks to line up correctly. (R. at 44.)  He testified that he lives in a house with his 65-year old mother, and no one else was available to change the light bulb.

Plaintiff testified to serious nerve damage in his back, bad balance, and carpal tunnel.  (R. at 44-45.)  He indicated that he would be unable to perform a sit-down job because his right hand was "deformed," and his fingers did not work very well.  (R. at 61.) To illustrate this, he made a fist for the ALJ, who observed that his middle finger did not bend all the way.  (Id.)  He did not undergo surgery for his carpal tunnel, however, because of money issues.  (R. at 61.)  Plaintiff noted that, as a result of his carpal tunnel, it was hard for him to hold onto objects, such as a gallon of milk, a coffee cup, or a hammer.  (R. at 62, 64, and 65.)  He testified that he had recently attempted to put up shelving, but was unable to do it correctly and had to have someone else come in to "put screws in it."  (R. at 66.)

In addition to the above impairments, Plaintiff indicated that he had undergone surgery on his heel in March 2011.  (R. at 66.)  He noted that his heel was still painful, but that his doctor did not find any issues with the surgery.  (R. at 67.)  Plaintiff also testified that he began seeing a social worker in 2011 because of his depression.  (R. at 68-69.)  He noted that he took the preliminary steps to

commit suicide by hanging, but aborted the attempt because he believed that God wanted him to stop.  (R. at 71.)

Plaintiff testified that he smoked two joints of marijuana per night, including an after-dinner joint, to relax him.  (R. at 47.)  Upon questioning from the ALJ, Plaintiff stated, "Yeah, I get high, I guess."  (R. at 68.)  He indicated that he receives the marijuana from a "caregiver," who gives him a discount.  (R. at 47.) Plaintiff noted that he was previously addicted to pain medication, but went through a treatment program.  (R. at 60.)  According to Plaintiff, the marijuana use lessens his need to take pain medication.  (R. at 67.)

Plaintiff testified that he had two sons, aged 21 and 22, and a daughter, aged 15.  (R. at 48.)  He indicated that the mother of two of his children owed him $30,000 in back child support and is a prostitute for crack.  (R. at 59.)  Plaintiff testified that he was 5' 8" tall and weighed about 200 pounds.  (R. at 49-50.)  He noted that he went to high school up to twelfth grade.  Although he did not graduate or obtain a GED, he testified that he was able to read, write, and do simple math.  (R. at 50.)  He has a tattoo on his arm that reads, "Time to get paid, shortchanged."  (R. at 58.)

Plaintiff testified that he had worked most recently in 2008 as a locksmith, but was fired because the job became too difficult for him.  (R. at 55.)  He started his career doing paper routes, working in a restaurant, and helping his father in a

7

shoe shop.  (R. at 55.)  The bulk of his working life was spent doing construction,

during which time he learned electrical work and framing.  (R. at 56.)  He testified

that his body could no longer handle the work, noting that his back went out in

1995.  (R. at 56 and 58.)  Plaintiff indicated that he had insurance through the

Jackson Health Plan, but had not looked at the Affordable Care Act website

because he was "just scared that it's going to cost more than I can come up with."

(R. at 51.)

### 2.    Vocational Expert Testimony

Toni McFarland testified as the Vocational Expert ("VE") at the

administrative hearing. The ALJ asked the VE to determine if there were any

positions in the national economy that a hypothetical person of Plaintiff's age,

education, and work experience, could perform at the sedentary exertional level

with the following limitations:

> [The hypothetical individual] requires a sit/stand option.  Who can do
> all occasional posturals.  That is climbing, balancing, stooping,
> kneeling, crouching, and crawling.  Who has manipulative limitations
> as follows: can frequently handle objects bilaterally; can frequently
> finger objects bilaterally.[2]
>
>                 *                 *                 *
>
> Environmental limitations as follows: avoiding exposure to the non-
> weather related extremes of cold and heat, that is concentrated

---

[2] At this point, the ALJ clarified that, although the most recent DDS report gave no
functional limitations with regard to manipulation, he limited the hypothetical
individual to only frequent fingering as a result of his severe carpal tunnel
syndrome.  (R. at 74.)

> exposure to hazards such as the operational control of moving
> machinery and unprotected heights; and simple, routine, and repetitive
> tasks. . . .   And occasional changes in the work setting.

(R. at 73-74.)   Based on this hypothetical, the VE identified a sample list of three

sedentary unskilled positions with a specific vocational preparation ("SVP") of 2.[3]

These included a document preparer, with 68,000 jobs nationally; a telephone

quotation clerk, with 55,000 jobs nationally; and a lens inserter, with 28,000 jobs

nationally.  (R. at 75.)

Next, the ALJ asked the VE to consider if these jobs would be available to

the above hypothetical individual, who was limited to only occasional handling

and fingering.  The VE answered that the above mentioned jobs would not be

available to the hypothetical individual, but identified a comprehensive list of two

sedentary unskilled jobs the hypothetical individual could perform: call out

operator, with 14,000 jobs nationally and surveillance system monitor, with 5,000

jobs nationally.  (R. at 76.)

### D.  THE ADMINISTRATIVE DECISION

On December 20, 2013, the ALJ issued his decision.  He first addressed the

impact of Plaintiffs previous applications for benefits, which were denied on May

---

[3] "The DOT lists an SVP time for each described occupation. Using the skill level
definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an
SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work
corresponds to an SVP of 5-9 in the DOT."  SSR 00-4P.

9

27, 2011.  (R. at 20.)  The ALJ adjusted Plaintiff's alleged onset date of April 1,

2008 to May 27, 2011 because of the prior final decision.  At Step 1 of the

sequential evaluation process,[4] the ALJ found that Plaintiff had not engaged in

substantially gainful activity since May 28, 2011, the day after the issuance of the

prior ALJ's opinion denying benefits.  (R. at 23.)

At Step 2, the ALJ found that Plaintiff had the following severe

impairments: lumbar degenerative disc disease, osteoporosis, carpal tunnel

syndrome, history of left calcaneal surgery, affective disorder, and substance abuse

disorder.  (Id.)

---

[4] Social Security Regulations require ALJs to resolve a disability claim through a
five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4).
Although a dispositive finding at any step terminates the ALJ's review, *see Colvin
v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential
review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet
   or equal the criteria of an impairment set forth in the Commissioner's
   Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the
   claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and
   residual functional capacity, can the claimant perform other work
   available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th
Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

At Step 3, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 23-25.)

Prior to Step 4 of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC")[5] and determined that Plaintiff had the capacity to perform sedentary work except with the following limitations:

> he requires a sit/stand option; can occasionally climb, balance, stoop, kneel, crouch, and crawl; can frequently handle and finger objects bilaterally; must avoid concentrated exposure to non-weather related extremes of cold and heat; must avoid concentrated exposure to humidity; and must avoid concentrated exposure to hazards, such as the operational control of moving machinery and unprotected heights. He can perform simple, routine, repetitive tasks and can have occasional changes in the work setting.

(R. at 25.)  The ALJ further noted that Plaintiff could not perform his past relevant work.  (R. at 30.)

At Step 5, the ALJ concluded that Plaintiff was capable of performing other jobs that exist in significant numbers in the national economy.  He therefore concluded that Plaintiff was not disabled under the Social Security Act.

---

[5] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §404.1545(a); *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

### E.   STANDARD OF REVIEW

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").  Furthermore, the claimant "has the ultimate burden to establish an entitlement to

12

benefits by proving the existence of a disability." *Moon v. Sullivan*, 923 F.2d
1175, 1181 (6th Cir. 1990).

Although the substantial evidence standard is deferential, it is not trivial.
The Court must "'take into account whatever in the record fairly detracts from
[the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384,
395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487
(1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this
Court defers to that finding 'even if there is substantial evidence in the record that
would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*,
581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997));
*see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security
as to any fact, if supported by substantial evidence, shall be conclusive . . . .").
Finally, even if the ALJ's decision meets the substantial evidence standard, "'a
decision of the Commissioner will not be upheld where the SSA fails to follow its
own regulations and where that error prejudices a claimant on the merits or
deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting
*Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

### F.  ANALYSIS

In his motion for summary judgment, Plaintiff asserts two overarching
statements of error.  First, he contends that the ALJ failed to fully develop the

record.  Second, he argues that the ALJ failed to consider the effects of his

impairments of obesity, affective disorder, and carpal tunnel syndrome.  In his

reply brief, Plaintiff also argues that the ALJ failed to weigh his credibility when

assessing his RFC.[6]  The Commissioner opposes Plaintiff's motion, asserting that

she is entitled to a grant of summary judgment because substantial evidence

supports the ALJ's conclusions.  I will address each argument in turn.

### 1.   The ALJ Fully Developed the Record as Required by 20 C.F.R. §§ 404.1512(d) and 416.912(d).

"The burden of providing a complete record, defined as evidence complete

and detailed enough to enable the [Commissioner] to make a disability

determination, rests with the claimant."  *Landsaw v. Sec'y of Health & Hum.*

*Servs.*, 803 F.2d 211, 214 (6th Cir. 1986); *see also Griffin v. Comm'r of Soc. Sec.*,

---

[6] Although not identified as a legal issue for review in his initial brief, I will consider Plaintiff's newly-raised credibility argument only because Defendant briefed the issue in her motion for summary judgment, based on Plaintiff's credibility discussion in the facts section of his motion for summary judgment.  I will not consider Plaintiff's argument related to the ALJ's treatment of the opinion of State Agency examiner Dr. Craig Brown, which has not been developed by Plaintiff and which was not addressed in Defendant's response.  It comprises one sentence of his initial motion for summary judgment, and one confusing paragraph in his reply.  It is unclear to the Undersigned in what ways Plaintiff purports that the ALJ erred in his consideration of Dr. Brown's opinion, which the ALJ discussed in his analysis, assigned little weight as inconsistent with Plaintiff's treatment records, but nevertheless limited Plaintiff to occasional changes in the work setting as a result.  *See McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (internal quotation omitted)).

No. 13-11089, 2014 WL 2864953, at *6 (E.D. Mich. Mar. 31, 2014) *report and recommendation adopted*, No. 13-11089, 2014 WL 2864993 (E.D. Mich. June 24, 2014) ("The ALJ is not required to 'ferret out' additional records that the claimant neglected to procure."). However, an ALJ has a "special, heightened duty to develop the record" in special circumstances, such as when the claimant is without counsel, "is not capable of presenting an effective case, and is unfamiliar with hearing procedures." *Nabours v. Comm'r of Soc. Sec.*, 50 F. App'x 272, 275 (6th Cir. 2002). Absent such circumstances, "the claimant bears the ultimate burden of proving disability." *Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008).

Plaintiff's argument with respect to the ALJ's development of the record centers around *Sims v. Apfel*, 530 U.S. 103 (2000), in which a plurality of the Supreme Court stated that "Social Security proceedings are inquisitorial rather than adversarial," thereby giving the ALJ the duty "to investigate the facts and develop the arguments both for and against granting benefits." *Id.* at 111-12. Plaintiff argues that because his intelligence is below average and he appeared *pro se* at the hearing, the ALJ failed to perform his special duty to develop the record and ensure a fair hearing. Plaintiff points to the May 1, 2013 mental status examination performed by Craig S. Brown, Ed.D., a licensed psychologist, who indicated that his intelligence was below average. (R. at 417.) He takes issue with

15

the ALJ's note that he had submitted very little medical evidence, asserting that it was incumbent upon the ALJ to provide him with extra time in which to assemble the missing documents.

Plaintiff's argument is somewhat compelling.  There is record evidence that Plaintiff's intelligence is below average, although the ALJ assigned little weight to the opinion stating as much.  (R. at 417.)  Plaintiff testified at his first hearing that he was "not really very intelligent" and did not understand the "processes and procedures."  (R. at 86.)  The argument fails, however, for two reasons.  First, Plaintiff has failed to demonstrate that he was not capable of presenting an effective case and was unfamiliar with hearing procedures.  Plaintiff had been through this process at least once before, in 2011, and possibly more.  (*See also* R. at 413, in which Plaintiff reported to Dr. Brown that he "has been denied for SS benefits many times.")[7]  He appeared and testified at the hearing in that case, although he was represented by counsel at the time.  In the instant case, the ALJ gave Plaintiff an extension of time in which to retain counsel, noting at the first hearing that after the adjournment was over, the hearing would go forward, whether he had a lawyer or not.  (R. at 89.)  At the second hearing, Plaintiff was again unrepresented, did not seek another extension, stated that three lawyers had

---

[7] Curiously, as skeptically pointed out by the ALJ, Plaintiff chose to demonstrate his arm strength by referencing his ability to "pick up a gallon of milk," a measure which is routinely employed in the RFC analysis.  (R. at 62.)

refused to take his case, and did not produce any information about the attorney who he purported was able to represent him in 2014.  (R. at 41.)

He further testified that he could read, write, and do simple math.  (R. at 50.) From the transcript, it appears that Plaintiff understood the ALJ's questioning and responded appropriately to the questions.  In addition, he was able to supplement the record with new medical evidence of his clavicle fracture, indicating that he had some familiarity with the procedures.  (R. at 41-42.)  There is no indication that, had Plaintiff been represented by counsel at the hearing, his testimony would have been meaningfully different.  Simply appearing unrepresented at the hearing is not sufficient to constitute a special circumstance requiring a heightened duty to develop the record.  *See Wilson*, 280 F. App'x at 459 (holding that there was no heightened scrutiny where the claimant appeared at the hearing unrepresented but the transcript "disclose[d] her grasp of the proceedings and the adequacy of her case presentation to the ALJ.").

Second, Plaintiff has not suggested what further information could have been brought forth at the hearing that would have affected the ALJ's disability determination.  *See Duncan v. Sec'y of Health & Hum. Servs.*, 801 F. 2d 847, 856 (6th Cir. 1986) (holding that the claimant received a full and fair hearing, although it was short and he was unrepresented, where he did not provide "what possible further information [that] could have been brought forth at the hearing which

17

would have enhanced a determination of disability."). As the Commissioner points out, when Plaintiff ultimately did retain an attorney, he did not proffer any new evidence that would support his claim prior to Appeals Council review. The ALJ did remark upon the fact that there was very little medical evidence in Plaintiff's record; however, Plaintiff himself attributed that to the fact that he had not had health insurance and had not seen a medical practitioner between 2011 and 2013. (R. at 92-93.) At the first hearing, the ALJ allowed Plaintiff to write down information about any practitioners he had seen who were not included in the administrative record, so that those records could be ordered. (R. at 93.) Plaintiff does not now point to any such record that was not included. Nor does he identify what more the ALJ could have done, absent delaying the hearing indefinitely until Plaintiff managed to obtain the assistance of an attorney. Accordingly, Plaintiff's argument on this issue is unpersuasive.

### 2. The ALJ Properly Articulated and Assessed Plaintiff's RFC

Plaintiff's RFC is "the most [he or she] can still do despite the physical and mental limitations resulting from [his or] her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); s*ee also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of Plaintiff's RFC is an issue reserved to the Commissioner and must be supported by substantial evidence. 20 C.F.R. §§ 404.1527(3), 416.927(e). "'ALJs must not succumb to the temptation to play

doctor and make their own independent medical findings.'"  *Simpson v. Comm'r of*

*Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98

F.3d 966, 970 (7th Cir. 1996)).

Pursuant to Social Security Rule 96-8p, the RFC assessment must include:

> [A] narrative discussion describing how the evidence supports
> each conclusion, citing specific medical facts (e.g., laboratory
> findings) and nonmedical evidence (e.g., daily activities,
> observations).   In assessing RFC, the adjudicator must discuss
> the individual's ability to perform sustained work activities in an
> ordinary work setting on a regular and continuing basis (i.e., 8
> hours a day, for 5 days a week, or an equivalent work schedule),
> and describe the maximum amount of each work-related activity
> the individual can perform based on the evidence available in the
> case record. The adjudicator must also explain how any material
> inconsistencies or ambiguities in the evidence in the case record
> were considered and resolved.

S.S.R. 96-8-, 1996 WL 374184, at *6-7. "Although SSR 96–8p requires a

'function-by-function evaluation' to determine a claimant's RFC, case law does

not require the ALJ to discuss those capacities for which no limitation is alleged."

*Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547 (6th Cir. 2002).  Instead, the

ALJ '"need only articulate how the evidence in the record supports the RFC

determination, discuss the claimant's ability to perform sustained work-related

activities, and explain the resolution of any inconsistencies in the record."'  *Id.*

(quoting *Bencivengo v. Comm'r of Soc. Sec.,* No. 00–1995,  251 F.3d 153, slip op.

at 5 (3d Cir. Dec. 19, 2000).

19

In the instant case, Plaintiff challenges the ALJ's findings related to his impairments of obesity, affective disorder, and carpal tunnel.  His primary argument seems to simply be that substantial evidence does not support the ALJ's conclusions that Plaintiff does not have significant work limitations related to these impairments.  I will consider each impairment in turn.

### a.  Obesity

When obesity is at issue, an ALJ need not employ a "particular mode of analysis" when considering its impact.  *Bledsoe v. Barnhart*, 165 F. App'x 408, 411-12 (6th Cir. 2006).  The ALJ must, however, "consider the claimant's obesity in combination with other impairments at all stages of the sequential evaluation." *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009).  While there is no longer a Listing for obesity, "obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing."  S.S.R. 02-1P.

The burden is on Plaintiff to show specifically "how the obesity, in combination with other impairments, limited her [or his] ability to a degree inconsistent with the ALJ's RFC determination."  *Smith v. Astrue*, 639 F. Supp. 2d 836, 846-47 (6th Cir. 2009).  Here, as support for his proposition, Plaintiff argues that Plaintiff's obesity accounts for his subjective complaints of back pain.  He fails, however, to point to any evidence that his obesity significantly exacerbated

20

his other impairments or that any resulting limitations were greater than those opined by the ALJ in his RFC assessment.  In fact, the only evidence in the record of the impact of Plaintiff's obesity on his other symptoms was his self-report to Dr. Brown that "his back hurts more from the extra weight."  (R. at 411.)  Nor did Plaintiff testify to the effects of his obesity at the hearing.  *See, e.g., Griffith v. Comm'r of Soc. Sec.*, No. Civ. A. 12-10579, 2014 WL 1213257, at *19 (E.D. Mich. Feb. 14, 2014) *report and recommendation adopted*, No. 12-15079, 2014 WL 1224807 (E.D. Mich. Mar. 24, 2014) (noting that Plaintiff's failure to testify about the limiting effects of obesity provided was evidence supporting the ALJ's limited consideration).  Accordingly, Plaintiff has failed to demonstrate that the ALJ erred in the consideration of his obesity.

### b.    Affective Disorder

Next, Plaintiff asserts that the ALJ's limitation to simple, routine, and repetitive tasks did not account for his "moderate to extreme" difficulties in maintaining concentration, persistence, and pace ("CPP").  (DE 14 at 28.)  As support, Plaintiff relies on the mental RFC assessment of State Agency reviewer Jerry Csokasy, Ph.D.  (R. at 202.)  Plaintiff argues that, as a result of this error, the ALJ's hypothetical to the VE did not account for all of his limitations and therefore was not supported by substantial evidence.

Plaintiff's argument is without merit.  As a preliminary matter, there is no support in the record for the proposition that Plaintiff has "extreme" difficulties in CPP, as he argues in his motion.  Instead, Dr. Csokasy opined that Plaintiff was only *moderately* limited in CPP and was "[n]ot significantly limited" in his ability to carry out very short and simple instructions.  (R. at 202.)  The ALJ accounted for Plaintiff's moderate limitations in CPP by limiting him to simple, routine, and repetitive tasks.  Such a limitation can appropriately account for a moderate impairment in CPP.  *See Bohn-Morton v. Comm'r of Soc. Sec.*, 389 F. Supp. 2d 804, 805-07 (E.D. Mich. 2005) (emphasizing the need for a case-by-case analysis and concluding that limiting a claimant to unskilled work adequately accounted for a moderate deficiency in CPP); *Lewicki v. Comm'r of Soc. Sec.*, No. 09-11844, 2010 WL 3905375, at *3 (E.D. Mich. Sept. 30, 2010)(noting that "[d]ecisions in this district reflect the conclusion that a moderate impairment in concentration, persistence, and pace does not necessarily preclude simple, routine, unskilled work.").  Accordingly, the ALJ's hypothetical to the VE accounted for his moderate limitations in CPP and was adequately supported by substantial evidence. *See Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002) (noting that substantial evidence "may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only if the

question accurately portrays [the claimant's] individual physical and mental impairments." (internal citations omitted)).

### c.       Carpal Tunnel Syndrome and Credibility

Plaintiff contends that the ALJ erred by failing to include manipulative limitations related to his carpal tunnel in the ALJ's hypothetical to the VE. The ALJ, however, did limit Plaintiff to *frequent* handling and fingering objects bilaterally.[8]  During the hearing, the ALJ stated the following with respect to Plaintiff's carpal tunnel syndrome:

> And I'll note, parenthetically, that the new [Disability Determination Services] report gives no functional limitations with regard to manipulative but finds carp[a]l tunnel to be severe. Given its severity and no limitations, I'm not going to go with occasional. . . . I'm going with frequent handling and fingering.

(R. at 74.)  He included this limitation in Plaintiff's RFC, and gave great weight to the opinion of State Agency non-examining clinician B.D. Choi, M.D., who opined that Plaintiff should have a "frequent limit on manipulation."  (R. at 185.) Moreover, consultative examiner Dr. Shetgeri found that Plaintiff's grip strength was full and his digital dexterity was intact, despite positive Tinel's and Phalen's sign bilaterally.  (R. at 403.)  Dr. Shetgeri also reported that "[m]anual muscle testing reveals strength of 5/5 throughout."  (Id.) Substantial evidence in the record, therefore, supports the ALJ's conclusion.

---

[8] The regulations generally define "frequently" as "occurring from one-third to two-thirds of the time."  S.S. R. 83-10.

Plaintiff additionally takes issue with the ALJ's reliance on his own testimony that he used a hammer to install shelving, noting that he "never successfully completed installation of the shelving." (DE 16 at 3.) However, the ALJ did not misrepresent Plaintiff's testimony. Specifically, the ALJ asked if Plaintiff could pick up a hammer, to which he replied "[w]ell, I could pick it up," but indicated that he would not be able to swing it. (R. at 63.) Later, Plaintiff testified that he finished the installation of the shelving, but it "didn't work out right." (R. at 66.) In addition, Plaintiff conceded that he was exaggerating when he said he dropped things "all the time." (R. at 64.) The ALJ's written opinion addressed Plaintiff's statement about his use of a hammer to install a shelf in the summer of 2013, finding that it weighed against the credibility of his subjective statements that he had trouble gripping and grasping items. (R. at 28.)[9] Such a credibility determination, based on Plaintiff's own testimony, was not in error. *See Torres v. Comm'r of Soc. Sec.*, 490 F. App'x 748, 755 (6th Cir. 2012) (concluding that the ALJ's credibility determination was supported by substantial evidence where the claimant's testimony was inconsistent with her reported activities of daily living).[10]

---

[9] Plaintiff also testified that he drops a cup of coffee "once a day, at least," but managed to spill (only) "two cups last week." (R. at 64.)

[10] In Plaintiff's recitation of the factual background, he asserts that the ALJ "cherry-picked" findings related to Plaintiff's ability to hold a hammer and Dr.

Plaintiff also argues that the ALJ erred in his credibility determination by noting that Plaintiff failed to seek medical treatment for his carpal tunnel impairment and his notation that Plaintiff abused marijuana. "The ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor." *Infantado v. Astrue,* 263 F. App'x 469, 475 (6th Cir. 2008); *see also Beavers v. Sec'y of Health, Ed., and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) ("The opportunity to observe the demeanor of a witness, evaluating what is said in the light of how it is said, and considering how it fits with the rest of the evidence gathered before the person who is conducting the hearing, is invaluable, and should not be discarded lightly."). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 469, 475 (6th Cir. 2007). Nevertheless, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters v. Comm'r Soc.*

---

Shetgeri's observations in order to justify his RFC assessment. Plaintiff does not make a similar argument in the "Law and Argument" section of his brief. To the extent Plaintiff makes such an argument, it is without merit. The argument that the ALJ mischaracterized or "cherry-picked" the record is seldom successful, because "the same process can be described more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009). "When deciding cases under 42 U.S.C. § 405(g) whether substantial evidence supports the ALJ's decision, we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 393 F.3d at 713. As addressed throughout this Report and Recommendation, substantial evidence supports the ALJ's conclusions and his decision provides an accurate summary of the administrative record.

*Sec.,* 127 F.3d 525, 531 (6th Cir. 1997). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters,* 127 F.3d at 531; *see also Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 863 (6th Cir. 2011) ("Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect.").

### 1.     Failure to Seek Medical Treatment

Here, the ALJ first noted that low cost or sliding scale medical treatment is available in the state of Michigan through County Health and Mental Health Departments, but that Plaintiff failed to receive treatment for his back or his carpal tunnel since 2010.  (R. at 27-28.)  Pursuant to Social Security Ruling 96-7P, an ALJ may not draw:

> any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment *without first considering* any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.

S.S.R. 96-7P (emphasis added).  For example, the ALJ should consider the claimant's explanation where the individual "may be unable to afford treatment and *may not have access* to free or low-cost medical services." *Id.* (emphasis added).  Here, Plaintiff argues that he failed to seek treatment because he did not

26

have insurance and that there was no low-cost insurance available before Michigan

adopted the Affordable Care Act funding provisions for Medicaid.  Plaintiff's own

testimony, however, indicates that he received health insurance through the

Jackson Health Plan and states that he had *never been on the new website for*

*healthcare under the Affordable Care Act*, because he was "*just scared that it's*

*going to cost more than I can come up with . . . .*"  (R. at 51.) (emphasis added).

Plaintiff does not address this testimony or clarify how the Affordable Care Act

funding provisions came into play, despite his admission that he never sought low-

cost insurance under the Act.  As such, the ALJ properly considered and drew a

negative inference from Plaintiff's failure to obtain treatment, when low-cost

treatment was available, especially where Plaintiff availed himself of that low-cost

treatment at some point with no coherent explanation as to why he failed to do so

earlier.

### 2.      Plaintiff's Use of Medical Marijuana

Plaintiff has shown no error in the ALJ's notation that he abused marijuana.

Plaintiff argues that the ALJ erred because he had a medical marijuana card,

permitted under MCL §§ 333.26421-333.26430.  While this may be true, the

argument fails for two reasons.  First, Plaintiff seeks benefits under the federal

Social Security Act.   Michigan's Medical Marijuana Act has been found to be

preempted by the federal laws that criminalize the possession of marijuana.  *Forest*

*City Residential Mgmt., Inc., ex rel. Plymouth Square Ltd. Divident Hous. Ass'n v. Beasley*, 71 F. Supp. 3d 715 (E.D. Mich. 2014). Plaintiff does not reconcile this issue, but simply indicates that the ALJ improperly failed to ask about Plaintiff's marijuana card (which Plaintiff never testified to having). Second, the ALJ merely stated that Plaintiff abused marijuana, based on his testimony that he smoked two joints per day and got high. (R. at 47 and 68.) Based upon this and his further testimony that, "[I]f I didn't have the marijuana, I'd probably be wanting to try more pain medicine to have relief" (R. at 67), and his testimony that "I get high, I guess" (R. at 68), this was a reasonable finding. Again, the ALJ's reliance on Plaintiff's own testimony is not in error and Plaintiff has not shown any way in which he was prejudiced by the ALJ's consideration of his marijuana use.

### G.   CONCLUSION

It is important to note that – far from giving short shrift to Plaintiff's contentions, treating him unfairly or merely rubberstamping the prior administrative decision – the ALJ in this case conducted a new and independent review and deviated from the prior ALJ's decision, by finding here that the claimant does have severe affective disorder and related functional limitations. (R. at 23, 30; *cf.* 158.) Moreover, although the ALJ found that Plaintiff was capable of performing sedentary work and thus not disabled for his age, his ruling does direct a finding of disability at age 50, pursuant to the Medical Vocational Guidelines.

(R. at 30.)  In other words, although Plaintiff (who was born in 1964) was deemed

not disabled during the relevant time period, today he is so categorized, and is thus

presumably able to collect whatever benefits to which he is entitled, consistent

with the relevant Social Security rules. In sum, from a review of the record as a

whole, the Undersigned concludes that substantial evidence supports the ALJ's

decision denying benefits for the relevant time period.  Accordingly, it is

**RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary

judgment, **GRANT** Defendant's motion for summary judgment, and **AFFIRM** the

Commissioner of Social Security's decision.

## III.    PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and

Recommendation, but are required to file any objections within 14 days of service,

as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule

72.1(d).  Failure to file specific objections constitutes a waiver of any further right

of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health &*

*Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some

issues but fail to raise others with specificity will not preserve all the objections a

party might have to this Report and Recommendation.  *Willis v. Sec'y of Health &*

*Human Servs.*, 932 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

*Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.*  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated: July 17, 2015            s/Anthony P. Patti
                                Anthony P. Patti
                                UNITED STATES MAGISTRATE JUDGE

I hereby certify that a copy of the foregoing document was sent to parties of record on July 17, 2015, electronically and/or by U.S. Mail.

                                s/ Michael Williams
                                Case Manager to the
                                Honorable Anthony P. Patti